Good morning, everyone. We're here today for oral arguments. We're going to begin with Appeal 25-1905, Jewel Sanitary Napkins, LLC v. Busy Beaver Publications, LLC. We'll begin with oral argument from the appellant, Ms. Highland. Good morning. May it please the Court. This appeal concerns the grant of summary judgment to Busy Beaver, which printed a letter disparaging Jewel Sanitary Napkins. Busy Beaver moved for summary judgment solely on the issue of actual malice, solely on the issue of fault. First, no other element of defamation is at issue here. To be clear, neither the truth or falsity of the publication is at issue. The only question is whether any jury issue exists on the question of actual malice reviewing the evidence de novo. Actual malice is reckless disregard of the truth, and it is largely demonstrated by circumstantial evidence. Circumstantial evidence is typically necessary because a defendant's denial of fault cannot be taken at face value. As stated by the Ninth Circuit, we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published. Here, the district court determined that there was no circumstantial evidence by which a reasonable jury could find that Busy Beaver acted with actual malice. In so holding, the court made credibility determinations, made numerous inferences in Busy Beaver's favor, mischaracterized evidence, misapplied the law, and engaged in fact-finding. I will identify seven categories of evidence of actual malice that make this case appropriate for a jury. The first is the testimony of Ivan Lapp, the Busy Beaver employee who was responsible for approving the letter at issue. Busy Beaver testified in its 30B6 deposition that Mr. Lapp did not entertain doubts about the letter, and the district court took this at face value, even though that same employee's conduct and testimony strongly inferred that he did entertain serious doubts. Indeed, when he was deposed, he was asked, did you have any concerns about printing it? To which he responded, I remember taking a second look at it, yes. He further testified that if the author had provided a phone number, he would have called her. He testified that he knew the letter was a warning, that it wasn't selling anything, and that he wasn't sure about it. Mr. Lapp stated under oath, on no fewer than three occasions, that he had no idea if the letter was true. How is that malicious? Well, the standard for actual malice is reckless disregard. So we're not really talking about private malice or the sense of malice in layman's terms. We're talking about reckless disregard. I've reviewed that portion of Mr. Lapp's deposition. I think you're quoting from pages 50 and 51. And frankly, from the black and white text, he comes across as someone trying to do his job. He has 1,400 of these a week. He sees this one, it does look different, but it doesn't strike him as something that he's not a proofreader, he's not an editor. It doesn't strike him as something to call to attention. How does that rise to the level of being malicious? I understand your question. Thank you, Your Honor. For one, I disagree that he was not a proofreader or an editor. I believe if he were merely republishing articles without making any editorial decisions whatsoever as a matter of practice, then I would agree with that characterization. But the Busy Beaver received numerous types of submissions that it would refuse to print, including this submission at issue was edited. So there was some level of editorializing occurring, both generally and with this article. And in regards to actual malice, I think the first question here is to start with his state of mind on whether he believed this was true or not. He said he had no idea. Usually in actual malice cases, we're looking at a journalist or some sort of publisher who at least believes that the article that they're printing is true. Here he had no opinion on it, read it, had concerns. I think by taking a second look at it, stating I would have called the author of this submission if I could have. He said I probably would have. I probably would have, yes. So we're making inferences here, right? We're not in front of a jury. We're at summary judgment. And so our job right now is to show that a reasonable jury could make an inference that that showed by circumstantial evidence and by his testimony a disregard of the truth, an understanding that something was amiss with this particular submission, a concern about it. And that's just the starting point, Your Honor. We go on from there. Oh, yes, and one other point I'd like to make is that because this is a summary judgment motion, the district court was required to make that inference in favor of Jewel and not in favor of Busy Beaver, which it did not do. The district court also disregarded Mr. Lapp's decision to hire a taxi to drive seven or eight miles to the author's home for the purpose of confronting her about where she got her information, bearing in mind that a publisher's conduct after publication can be circumstantial evidence about their state of mind at the time of publication. We have to consider that Mr. Lapp admitted that he was concerned about the letter. He knew it was a warning. He didn't know if it was true. He probably would have called the author to question her about it had she given her phone number. And now with that entire backdrop, we now have his decision to make a lengthy in-person trip to try to speak to her directly. This further evidences his uneasiness about the letter, and they're not the actions of someone who believed that the letter was truthful. They're the actions of someone who entertained subjective doubt about the truth of what had been published. Again, none of these facts were considered by the district court in granting summary judgment. The second category of evidence that I'd like to discuss is the changes that were made to the letter. We know that an unknown Busy Beaver employee changed the punctuation of the letter to make the impact of the letter softer, turning statements into a question and removing exclamation points. By altering the submission, it could be inferred, and therefore must be inferred, in Jewel's favor, that Busy Beaver knew the statement was likely untrue and made these changes to try to reduce its risk in publishing. Yet the district court wrongly ignored this fact as well and actually stated that the ad, quote, conformed to the original submission in all material respects and that the change made, quote, no difference as to whether Busy Beaver may have suspected the letter was false. These findings improperly weighed the evidence and drew inferences in Busy Beaver's favor. Did Jewel attempt to depose any of the typists or ask them about their standard procedures for punctuation? Trying to get to the identity of the typist has been an issue in this case. We learned from Mr. Lab, who was originally identified as the typist of the letter, that he was not actually the typist of the letter. We were given information and discovery after that that Busy Beaver did not know who the typist of the letter was and it could have been any of Mr. Lab's family members, including his wife and his daughters. So if Busy Beaver was unable or its lawyers were unable to identify the typist, there didn't seem to be much merit in us holding numerous depositions to try to get at precisely the fact that their own counsel was unable to discover. So the answer was no? We did not depose the typist. The answer is no. Correct. The third and fourth categories of evidence are closely related. The third is the nature of the letter itself. It was highly disparaging. And, as a matter of law, reckless conduct can be evidenced, at least in part, by a failure to investigate thoroughly when the material is particularly harmful or damaging to the plaintiff's reputation. In other words, while the law does not impose a duty to investigate generally, it can be evidence of actual malice where no investigation occurs, and the statement is highly disparaging, which brings us to the fourth category of evidence, which is Busy Beaver's failure to investigate, which also can be construed as purposeful avoidance of truth. Here Mr. Lab had concerns about the letter due to its facially disparaging nature, and they were serious enough that he said he probably would have called the author if he could. So what did he do next? Nothing. He made no effort whatsoever to verify the information that he admitted that he wanted to verify. The record is replete with factual issues on whether Mr. Lab could access the Internet or not, but there can be no dispute that Mr. Lab was not totally powerless to do any fact-checking, at least by raising the issue with a co-worker. We've required fact-checking long before the advent of the Internet, and Busy Beaver cannot get a pass to defame simply because some of its employees don't use the Internet. They also cannot get a pass to defame simply because they are on a deadline. All publishers are on a deadline, and this does not mean that they can print with impunity. Yet this was the district court's conclusion. The court found that Busy Beaver had no duty to investigate because Mr. Lab reads 1,400 ads per week and cannot access the Internet. That is a fact that is also clearly disputed. But regardless, there is no Internet-avoidant defense or too-busy-to-investigate defense, nor should there be, particularly in a case like this, where there was no urgency or hot news that required immediate publication. The fifth category of evidence is Busy Beaver's failure to comply with its own policies. We know that it had a policy not to print anonymous ads. We also know it had a policy not to print disparaging content about third parties. It's true that departure from accepted standards is not, on its own, evidence of actual malice, but it can, in connection with other evidence, create an inference. Indeed, the Supreme Court affirmed the Sixth Circuit's reliance on exactly that type of evidence in Hart-Hanks Communications. Would you like to reserve... Yes, I'd like to reserve the rest of my time for rebuttal. Thank you so much. Very good. Thank you, Ms. Hyland. Ms. Rome, we'll move to you now for oral argument on behalf of the appellee. May it please the Court, my name is Erin Rome, and I will be presenting argument on behalf of Busy Beaver Publications. Based on what you just heard from Counsel for Jewell and what you read in the briefs, it may seem like there's a lot going on in this case, and there certainly are unique facts that we don't see every day. We have a creator of a menstrual pad suing an Amish advertising publication. We have discussions about a strip of graphene in a menstrual pad that can be used to light up a light bulb We have assertions about how much Internet usage different members of the Amish community have. That's all interesting background noise, but this case ultimately comes down to one issue and one issue only, and that is lack of evidence of actual malice. Actual malice was raised as the primary defense at the pleading stage, and to avoid summary judgment, Jewell needed to present clear and convincing evidence on that one issue, that Busy Beaver published the Lantz submission knowing it was false or with a high degree of awareness of probable falsity. The subjective standard, looking at the state of mind of the person who made the publication decision. There is no evidence of that on this record. Is Mr. Lapp's hesitation at printing the ad and questioning its nature evidence of reckless disregard given his familiarity with typical Busy Beaver ads? It's not when you look at what he says about that. He says he took a second look because of the nature of the ad, because it wasn't selling something and it was questioning someone else's product, but none of that goes to truth or falsity, that he subjectively believed that any statements in the Lantz submission were false or that he was concerned about truth or falsity. Well, he says, yes, it was a warning. It wasn't a true warning. I didn't know, and there wasn't a phone number there, so I couldn't call her. At that juncture, is he on notice that there's a problem here and this is not like the other 1,399 ads he saw that week? No, because nothing about that has any indication that he was concerned the statements were false. And when you look at the other submissions that are in the same category of the Busy Beaver, there's a category called Health and Natural Products, and this is where this ad was. In that same edition of the publication, there are other ads that are similar talking about products, talking about are your products toxin-free? Could these products be harming your children? There are other examples on the same page that the Lantz submission appeared on making these same types of statements. So it's within the types of ads that the Busy Beaver routinely publishes. And I think this really brings me to a key issue of why the actual malice standard and First Amendment principles are important here. Juul Sanitary Napkins created this product and has put a lot of information into the public sphere about the safety of menstrual products in general and about why its product is the safest and most preferable alternative. And what we have going on here is Juul attempting to control this space around commentary on its product. Juul says that its product is toxin-free, that it can cure cramps, it can move heat away from your core because it contains vibrational energy, and that its product is safe, but... Is your statement writ large or just for the Amish community that Juul is taking these steps? Both, both. As you'll see, there are routinely a number of ads for RAINN products in the Busy Beaver. In this same edition, on the same page as the Lantz submission, there were other ads talking about Juul's products being all-natural, chemical-free. So what we have here is a product manufacturer who is making a lot of statements about its product but attempting to quash any speech that it disagrees with. And the First Amendment provides protection about that, especially when the submission is providing commentary on the safety of the product. It's the same category of speech that Juul itself is asserting. And that's why the First Amendment protections and actual malice standard is important here. Turning to the lack of evidence of actual malice, Juul has a lot of theories about what might have been in Ivan Lap's mind. But we don't need to go there because Ivan Lap himself said what he was thinking. Document 36 in the record is Lap's declaration. Because of the way this case transpired, Juul had the benefit of two declarations submitted by Ivan Lap before they took his deposition. He said he looked at the Lantz submission, didn't know whether any statements in it were true or false, and that he still does not know. In Lap's deposition, which came after Juul had the benefit of those declarations, they didn't ask him any follow-up questions on that, any follow-up questions on his subjective belief about the truth or falsity of the Lantz submission. So we're left with a record where Juul wants us to speculate and insert hypotheticals about what might have been in Ivan Lap's mind. But there was an opportunity to get that information directly from the source, and Juul declined to do that in favor of asking for speculation and asserting inferences. I think it's important also to keep in mind what Ivan Lap says about the types of submissions that he's declined to print in the past. He talks about this in his deposition. He talks about the mission of Busy Beaver, which is to intertwine horse and buggy Amish communities, and the types of submissions that he has declined to print in the past are things that don't fit within the mission of the Busy Beaver. These are political ads, campaign ads, ads for rock concerts, ads with women in bikinis. These things don't fit within the Amish culture, and those are the types of submissions he has declined to print. The way of submission is not that. It is within the range of the many other health and natural product ads that are in the Busy Beaver. Turning to the issue of speculation, Juul's circumstantial evidence factors rely on speculation and conjecture, not actual evidence. Juul made a conscious decision to rest its case on speculation rather than obtaining direct evidence and facts, and this is shown by the fact that Juul decided not to depose Ivan Lap until after the summary judgment briefing had already been concluded and never asked any questions of Betty Lance herself, despite knowing that Betty Lance was the person who authored the ad in September of 2022, long before this lawsuit was ever filed. Juul had an obligation to come forth with facts from which a reasonable jury could find that Busy Beaver acted with actual malice by the clear and convincing evidence standard, the higher burden of proof, and it didn't do that. Instead, we're left with speculation and hypotheticals about what might have happened and questions about whether summary judgment was properly granted. We have, in Seventh Circuit case law, in federal case law, in Anderson v. Liberty Labadee, the Bose case, telling us that summary judgment is a preferred method in actual malice cases because of the potential chilling effect on speech if these cases are allowed to go to a jury without the court exercising its independent review. And that's important to keep in mind here. Summary judgment, as this court has said, is the put-up-or-shut-up time, and speculation does not create a genuine issue of material fact. There might be some quibbles about facts in the record here, but we need to look at whether it's a material issue of fact that controls the outcome of the dispute, and there are no material issues of fact in this record. Based on all of the evidence in the summary judgment record as a whole, there are no facts to support a finding by a reasonable jury by clear and convincing evidence that Fizzy Beaver published the Lantz submission knowing it was false or with a high degree of awareness of probable falsity. Evidence of the publisher's subjective state of mind is what matters here, and that is lacking on this record. Unless you have other questions, I think that's all I have. Fizzy Beaver asks that the court affirm the decision of the district court, but I'm open to any other questions that you may have. Thank you, Ms. Rommel. Thank you. Ms. Hyland, we'll move now to you for rebuttal argument. Ms. Hyland, let me start you out on... Nobody can turn the clock backward, but let's talk a little bit about litigation strategy. The briefs don't show what Juul's alternative litigation strategy would have been if it had earlier knowledge of the original submission form. How would it have changed? Well, Your Honor, I think you would have seen some re-judgment briefing that included the changes to the submission that would have included the extraordinarily unusual fact that the submission was hand-delivered back to the author at the time that it was, in September of 2022, I believe, or 2023. The story was just so much more complicated than was revealed to Juul during the normal course of discovery, and I think... But, Ms. Hyland, let me ask you about that a bit more. Some of those facts that you just described came to light after the summary judgment briefing had gotten underway, but you were still able to take another deposition after the normal time, and then all those facts were in front of the district court judge through the vehicles of either the summary judgment briefing or the sort of sanctions-related motions or the motions to reopen the summary judgment briefing. And the district court did take into account things like the lap deposition when it granted summary judgment to Busy Beaver. And so, in substance, it seems to me like you got all those things. Even if the summary judgment wasn't formally reopened, there's no dispute that all those facts were properly before the district court and the district court considered them. Correct, Your Honor. It's very clear from the record that the district court considered Mr. Lapp's deposition. In fact, the court cited to it. So, in a sense, yes. I mean, it's procedurally very odd, but we do have a situation where that deposition was part of the record. We never had the opportunity to actually argue around it and present legal argument or present a statement of material facts, but the court certainly did consider it. There's no question about that. And I think what we've seen here, too, is Busy Beaver has been projecting the consequences of its own misrepresentations onto Jewell. And, you know, this is a case where Busy Beaver created this problem through misdirection and discovery. Jewell was responding in real time. And, you know, we can look back and do the could have, would have, should have sort of thing, but the reality is that we took a 30B6 deposition that was binding on that company and that is intended to reduce the need for multiple depositions of corporate witnesses. So we were reacting to those representations. I know I've got just a few seconds left, and I just wanted to bring the court's attention to Carson v. Allied Muse, which is a Seventh Circuit case from 1976. And I'd like to quote from it. He repeatedly admitted that he did not know whether what he said was true. He repeatedly admitted that he did nothing or almost nothing to verify his charges. As to most of his statements, he repeatedly admitted that he knew no facts to support them. He simply asserted that what he believed he said was true. Such an assertion is not enough. And here, the district court was wrong to decide under very similar facts that it was enough. Thank you, Ms. Hyland. Thank you, Ms. Roem. The case will be taken under advisement. Thank you, Your Honor.